UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION
_____

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                              No. 1:23-mj-00230-RSK

                                                    Hon. Raymond S. Kent

ANDREW BLAIR HOWARD                U.S. Magistrate Judge

       Defendant.

_____/

**DEFENDANT ANDREW BLAIR HOWARD'S RESPONSE TO
GOVERNMENT'S SENTENCING AND RESTITUTION MEMORANDUM**

I.     Restitution

    A.    Standard of Review

Restitution orders are subject to a bifurcated standard of review. *United States v. Sawyer*, 825 F.3d 287, 291 (6th Cir.), *cert. denied*, 137 S. Ct. 386, 196 L.Ed. 2d 304 (2016). "'Whether a restitution order is permitted under the law is subject to *de novo* review . . . whereas "the amount of restitution ordered is reviewed under the abuse of discretion standard." *Id*. at 291-92 (quoting *United States v. Elson*, 577 F.3d 713, 720 (6th Cir. 2009) and *United States v. Johnson*, 440 F.3d 832, 849 (6th Cir. 2006).

Restitution orders involve examining the court's record as a whole and are fact-intensive

1

inquiries:

> The determination of whether the district court committed error in its calculation of restitution is a fact-intensive inquiry. See [*United States v.*] *Seignious*, 757 F.3d [155] at 163 [4th Cir. 2014] (noting that a district court's view of the evidence must only be "plausible in light of the record viewed in its entirety") . . .

*United States v. Stone*, 866 F.3d 219, 226 (4th Cir. 2017).

B.  Analysis

1. The Trial of this matter.

At the trial of this matter, the testimony of witnesses for the government and those witnesses called by Defendant Andy Howard established one thing loudly and clearly: that Mr. Howard played no role in opening the channel of the Platte River to Lake Michigan, much less contributing to the channel's enlargement.  His involvement in this matter occurred after the channel, dug by others, had already been opened to the lake.  A brief review of the trial evidence that conclusively establishes that fact is appropriate.

National Park Law Enforcement Officer Logan Bahm was the first witness called by the government.  Officer Bahm testified to observing the existence of "wing dams" prior to his interaction with Mr. Howard.

> Q And in that conversation you said that you knew he didn't build the dams. That they were there before. To be clear, what did you see him doing with respect to those dams?
>
> A There were several wing dams in the area prior to this interaction. However, Mr. Howard was seen adding rocks to them and I had not seen any diversions or structures divert flow out towards a new river mouth like I had that day.

(ECF No. 19, PageID.69)[1]

Officer Bahm's testimony above is silent, as is silent the testimony of each of the remaining witnesses called at trial, as to how Mr. Howard's *conduct* contributed one iota to the

---

[1] ECF No. 19 is the transcript of the trial of this matter that occurred on February 7, 2024.

channel's opening to the lake.  In fact, the channel's initial creation, again, without the participation of Mr. Howard, according to Officer Bahm, expanded and enlarged over the following days:

> Q And generally, between August 15th and August 18th, I don't need specific measurements, but generally what happened to that diversion?
>
> A The diversion grew in width, and more -- it seemed more water had started flowing out in that direction.

(ECF No. 19, PageID.75)

The conclusion that the conduct of Mr. Howard did not contribute to the channel's enlargement is born out by the *number* of rocks that he was observed moving.

> Q Well, maybe we can talk about it a little different way. How long did you see Mr. Howard putting specific activity -- putting rocks onto what has been referred to now as wing dams?
>
> A While in the position I returned to the observation location for several minutes as well as -- as I approached and the body camera footage that was seen.
>
> Q Would it be fair to say a handful of rocks, half dozen?
>
> A I would say that.

(ECF No. 19, PageID.80)   A half dozen rocks.

Similarly, and consistent with Andy Howard's lack of involvement in contributing to the channel's expansion, is his brief involvement after the channel's opening by shoveling  - "five minutes of shoveling activity."

> Q About five minutes there are attempted shovels and then there were completed shovels? I didn't understand.
>
> A At least five minutes of shoveling activity.

(ECF No. 19, PageID.31)

The government's next witness was Zachary Hatfield.  Witness Hatfield testified that he observed Andy Howard digging in the channel towards Lake Michigan.  (ECF No. 19, PageID.39-40)   Importantly, from a time-stamped photograph, the witness established that digging occurred at approximately 6:11 and 6:12 p.m.

> Q Government's Exhibit 12 and 13 were taken at approximately 6:11 and 6:12 p.m. Does that sound about right to you?
>
> A Yes. It does.

(ECF No. 19, PageID.41)

Witness L.S. testified that Mr. Howard was having children assist him in digging the channel at the beach - as many as ten of them.  (ECF No. 19, PageID.48)   Her testimony is substantially undermined by stipulated photographic evidence to the contrary.

> Q And how many -- how many would you say you see in that picture; about five; fair statement?
>
> A Yes.
>
> Q You don't see them digging or moving any rocks, do you?
>
> A No.

(ECF No. 19, PageID.48)

Next, Witness Jamie Nelson testified that *he* did *not see* the five to ten children digging at the beach that had been described by the previous witness.  (ECF No. 18, PageID.54)

Witness Carrie Allgaier testified to the activity of Andy Howard that can be best described as sporadic in wading and from time to time "feeling around for rocks" over less than an hour's time.

> Q And approximately how long did you observe the man digging with the shovel?

4

>A I don't know exactly. I was probably there with my kids for maybe a little less than an hour in that exact spot, and he was just kind of wading in that area.

(ECF No. 19, PageID.57)

>Q Was he wading in the area or digging with his shovel the entire time that you were at the river?
>
>A When I was in that spot it was kind of on and off. It wasn't vigorous constant digging or anything. It was more just wading and kind of feeling around for rocks it seemed like what he was doing.

(ECF No. 19, PageID.57)

Witness Kirk Walby observed Andy Howard moving rocks for "[p]robably a half hour, maybe a little more."  (ECF No. 19, PageID.65)

Officer Scott Dekkers placed into perspective the existence of rock dams before August 15, 2022.

>Q Now, it's not a fair impression that rock dams are new or of relatively recent creation in that stretch of the river, is it?
>
>A The National Park Service was aware that there is rock formations in that river. They moved over time.

(ECF No. 19, PageID.80)

>Q Look roughly under that box that says Google Earth Pro Image 2. Look down there about an inch and-a-half on the bottom edge of that box. Do you see in that photograph what appear to be dark, and I am going to suggest, rock dams protruding into the long channel that flows down into the end of that stretch of river?
>
>A Yes. I see a formation.
>
>Q Pardon me. You see a formation?
>
>A A formation of something. A dark line.
>
>Q Okay. It wouldn't be inconsistent with what are the rock dams that have been described earlier, would it?

A No. Not inconsistent.

(ECF No. 19, PageID.81)

The defense called witness Amy Roche.  Ms. Roche testified that in the mid-afternoon, she saw digging with "toy shovels like children's shovels" but did not see any of the shovels that she refers to as "adult tools".  (ECF No. 19, PageID.86)   She described the digging as "vigorous" and done predominantly by ten to twenty children and teenagers.  (ECF No. 19, PageID.86)

Ms. Roche testified that she was at the beach between 1:00 p.m. and 3:00 p.m. and between those times and at the time of her leaving had no knowledge of what happened to what is described as the "trench".  (ECF No.19, PageID.89)

Witness Laura Calleja testified that she saw children digging - chanting and working as a team.  (ECF No. 19, PageID.96)   Ms. Calleja testified that as a consequence of that, the following happened:

> Q Did anything happen? What happened? What resulted from that?
>
> A The -- the river was diverted. It was very fun for the beach goers because as people were approaching the water was rushing so much people were bringing their floaties up, kids were kind of rafting down. It was a toy to them. And when it was time for us to leave, it was very difficult to even walk in that current because, you know, we had to get to that other side to go to the parking lot. So it was -- honestly, it was an amazing thing that it happened as quickly as it did.

(ECF No. 19, PageID.97)
Significantly, Ms. Calleja did not see Andy Howard during that time.

> Q We'll get to that one in a second. I think I might not have asked you earlier. At any point in time you didn't see Mr. Howard by that trench?
>
> A No, sir.

(ECF No. 19, PageID.100)

6

The final witness to testify at trial was Andy Howard. Mr. Howard, having purchased two shovels in Frankfort, Michigan, arrived at the beach between 5:00 and 5:30 pm.

> Q All right. Did you see on Exhibit S, page 1, any time
> noted at the time you purchased the shovels at the hardware
> store?
>
> A 4:23 p.m.
>
> Q And that's from the first page of Exhibit S?
>
> A Yes.
>
> Q All right. And so you got back to the -- you got back to
> the Platte River there, and what did you do next? Excuse me.
> How long a drive is it from Frankfort -- let me finish,
> please -- from Frankfort hardware store in Frankfort to the
> Platte River?
>
> A Approximately 30 minutes.
>
> Q Okay. So what time did you get back there as best you
> recall?
>
> A Five to five-thirty.

(ECF No. 19, PageID.113)

Andy Howard's reaction to a channel having opened to Lake Michigan can be best described from his testimony describing when he arrived and what he saw. 113-14

> Q All right. And when you got back there, what did you do?
>
> A I took one of the shovels and I hiked down along the river
> with the thought in mind that I would try to move some
> hazardous rocks as I have done for many years without ever
> being questioned, sometimes for hours at a time, moving rocks
> and improving the passage of the boat. And so when I walked
> down there and saw the new river diversion where they used to
> drudge it I was in shock and I was also elated. I was actually
> ready to sing the hallelujah chorus and dance around because I
> could not believe -- it was like a miracle of God that this
> river opened up from when I left at noon and come back here.
> It's blasting and wide open right exactly where all of us
> fishermen would have preferred it be for the last five years.
> There have been plenty of conversation about different ways we

7

could go down and try to open it and a lot of different strategies came up over a five year period, but it was really something to see without knowing how it even happened. I just -- it just -- it just felt miraculous.

(ECF No. 19, PageID.113-14)

Q Let's focus a little more now on what you did when you got there. What did you do when you got down to that lake with -- down to that channel with your new shovel?

A Well, when I went down there, instead of working on the old branch of the river I crossed over to where the new branch was and I was digging in the sand. There would be new rocks that would appear out of the sand because the river was like white water. I could hardly stand up it was rushing so hard. And so it was revealing new rocks, so I was taking those rocks, moving them to the side. But I felt the power of the water. If I would stick my shovel in the sand where I was shown at the new bank, it was like a glacier melting.
There was two feet deep of sand walls that were just falling in due to the current. So me sticking my shovel in was of, like, no consequence to the outcome. Had I done absolutely nothing, had I gotten back into my car, the outcome of this river diversion would not have changed. My actions did not impact the outcome of the diversion of that river in one respect. And I told the ranger, I did not move one grain of sand before that new river diversion opened up. I had absolutely zero to do with the opening of the new branch of the river, otherwise, I wouldn't be sitting here today if I would have done it. I would have pled guilty and accepted my rightful punishment.

(ECF No.19, PageID.115-160)

    2. <u>The Mandatory Victims Restitution Act should not apply in this matter.</u>

Andrew Howard, charged by way of a two-count Class B Misdemeanor Information, stands convicted of the offenses of tampering (Count 1) and vandalizing (Count 2) property, within the boundaries of Sleeping Bear Dunes National Lakeshore.

Those offenses are described in the following regulations:

**§ 2.31 Trespassing, tampering and vandalism.**

(a) The following are prohibited:

8

(2) Tampering. Tampering or attempting to tamper with property or real property, or moving, manipulating or setting in motion any of the parts thereof, except when such property is under one's lawful control or possession.

(3) Vandalism. Destroying, injuring, defacing, or damaging property or real property.

36 C.F.R. § 2.31 (in part).

The Restitution provisions of 18 U.S.C. § 3663A do not apply to this matter. 18 U.S.C. § 3663A, the Mandatory Victims Restitution Act (MVRA) applies to a limited number of described offenses set forth in a subsection thereof. That statute states in relevant part:

**§ 3663A. Mandatory restitution to victims of certain crimes**

(a)

(1) Notwithstanding any other provision of law, *when sentencing a defendant convicted of an offense described in subsection (c)*, the court shall order, in addition to, or in the case of a misdemeanor, in addition to or in lieu of, any other penalty authorized by law, that the defendant make restitution to the victim of the offense or, if the victim is deceased, to the victim's estate.

18 U.S.C.S. § 3663A (in part, italics supplied).

Subsection (c), referred to above, states the following:

(c)

(1) This section shall apply in all sentencing proceedings for convictions of, or plea agreements relating to charges for, any offense—

(A) that is—

(I) a crime of violence, as defined in section 16 [18 USCS § 16];

(ii) *an offense against property under this title*, or under section 416(a) of the Controlled Substances Act (21 U.S.C. 856(a)), including any offense committed by fraud or deceit;

(iii) an offense described in section 3 of the Rodchenkov Anti-Doping Act of 2019 [21 USCS § 2402];

(iv) an offense described in section 1365 [18 USCS § 1365] (relating to tampering with consumer products); or

(v) an offense under section 670 [18 USCS § 670] (relating to theft of medical products); and

9

(B) in which an identifiable victim or victims has suffered a physical injury or pecuniary loss.

18 U.S.C.S. § 3663A (in part, italics supplied).

The MVRA applies to offenses against property "under this title". The "title" referred to above, Title 18 of the United States Code, does not contain the offense described in the Code of Federal Regulations set forth above, and the offenses of which the Defendant stands convicted. Put simply, the Defendant was not convicted of an offense under Title 18, his offenses are described in the Code of Federal Regulations, and the MVRA thus does not apply.

Before this conclusion can be reached, however, it is necessary to compare the relevant statute applicable to the *sentencing* of the Defendant with the relevant federal regulations that are the *offenses of conviction*.

Title 18 of the United States Code contains the following:

**§ 1865. National Park Service**

(a) *Violation of regulations* relating to use and management of National Park System Units. A person that *violates any regulation* authorized by section 100751(a) of title 54 [54 USCS § 100751(a)] shall be imprisoned not more than 6 months, fined under this title, or both, and be adjudged to pay all cost of the proceedings.

(b) Financial disclosure by officers or employees performing functions or duties under subchapter III of chapter 1007 of title 54 [54 USCS §§ 100731 et seq.]. An officer or employee of the Department of the Interior who is subject to, and knowingly violates, section 100737 of title 54 [54 USCS § 100737] or any regulation prescribed under that section shall be imprisoned not more than one year, fined under this title, or both.

(c) Offenses relating to structures and vegetation. A person that willfully destroys, mutilates, defaces, injures, or removes any monument, statue, marker, guidepost, or other structure, or that willfully destroys, cuts, breaks, injures, or removes any tree, shrub, or plant within a national military park shall be imprisoned not less than 15 days nor more than one year, fined under this title but not less than $10 for each monument, statue, marker, guidepost, or other structure, tree, shrub, or plant that is destroyed, defaced, injured, cut, or removed, or both.

> (d) Trespassing in a national military park to hunt or shoot. An individual who trespasses in a national military park to hunt or shoot, or hunts game of any kind in a national military park with a gun or dog, or sets a trap or net or other device in a national military park to hunt or catch game of any kind, shall be imprisoned not less than 5 nor more than 30 days, fined under this title, or both.

18 U.S.C.S. § 1865 (italics added).

The foregoing statute describes <u>offenses</u> in subsections (b), (c), and (d), above. It does not, however, describe an offense in subsection (a), instead, referring to a provision of Title 54 of the United States Code that authorizes the Secretary of the Interior to prescribe regulations.[2] And from which those offenses are published in Title 36 of the Code of Federal Regulations.

Again, among the regulations that the Secretary of the Interior has prescribed are those set forth above and contained in the Code of Federal Regulations. Those are regulations that Andy Howard, it was alleged in this case, violated. Those are not offenses contained in Title 18 of the United States Code.

Applying the language defining the scope of the MVRA to both the penalty provisions of 18 U.S.C. § 1865(a) and 36 C.F.R. § 2.31, but one conclusion is clear - the offenses of which Defendant Howard has been convicted - tampering and vandalism - are not described or contained in Title 18 (here,18 U.S.C. § 1865). They are described and they exist in 36 C.F.R.

---

[2] § 100751. Regulations
(a) In general. The Secretary shall prescribe such regulations as the Secretary considers necessary or proper for the use and management of System units.
(b) Boating and other activities on or relating to water. The Secretary, under such terms and conditions as the Secretary considers advisable, may prescribe regulations under subsection (a) concerning boating and other activities on or relating to water located within System units, including water subject to the jurisdiction of the United States. Any regulation under this subsection shall be complementary to, and not in derogation of, the authority of the Coast Guard to regulate the use of water subject to the jurisdiction of the United States.
(c) Criminal penalties. Criminal penalties for a violation of a regulation prescribed under this section are provided by section 1865 of title 18 [18 USCS § 1865].

54 U.S.C.S. § 100751.

11

§ 2.31. It is within that regulation that the conduct that is prohibited and constituting the offenses of which Andy Howard was convicted are to be found.

And to reiterate one final point, the federal criminal statute, 18 U.S.C. § 1865, does *not set forth* any offense of which Andy Howard stands convicted. Section 1865 *does specifically describe a variety of offenses* - offenses relating to financial disclosures by officers (subsection (b)); offenses related to structures and vegetation (subsection (c)); and, trespassing in national parks to hunt and trap (subsection (d)). However, no offense of which Mr. Howard is convicted is set forth in that provision of Title 18 - or as the MVRA requires in subsection (a) - "an offense described in subsection (c)" that is, "an offense against property *under this title*."

The federal courts have denied restitution where the offense of conviction appears within a title of the United States Code other than, as the MVRA requires, an offense listed in Title 18. Where a defendant was convicted of an offense listed in Title 15, the MVRA does not apply.

> These restitution statutes are triggered by specified convictions. The MVRA applies only in "sentencing proceedings for convictions of . . . an offense against property under this title [i.e., Title 18]" or of certain other specified crimes not relevant here. 18 U.S.C. §3663A(c)(1) (emphasis added). The VWPA similarly authorizes restitution only "when sentencing a defendant convicted of an offense under this title" (again referring to Title 18) or certain drug and transportation law offenses. 18 U.S.C. §3663(a)(1)(A) (emphasis added).
>
> Petit was convicted of a Title 15 offense: securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5. Although the Second Circuit has not directly addressed whether these restitution statutes cover securities fraud, it has held that district courts cannot impose restitution under these restitution statutes unless the offense is contemplated by those statutes. See, e.g., *United States v. Adams*, 955 F.3d 238, 250 (2d Cir. 2020) (holding that neither the MVRA nor the VWPA permits restitution for Title 26 offenses); *United States v. Fore*, 169 F.3d 104, 110 (2d Cir. 1999) (holding that the MVRA does not permit restitution for Title 42 offenses).
>
> For the same reasons, other courts have held that neither of these statutes permits restitution for Title 15 offenses, such as securities fraud. See United States v. Acord, 790 Fed. App'x 18, 19 (5th Cir. 2020) (per curiam) (holding that "[n]either [the MVRA nor the VWPA] authorizes a restitution award for violations

12

of Title 15"); *United States v. Frith*, 461 F.3d 914, 919 (7th Cir. 2006) (same). And other district courts in this Circuit have so held. See *United States v. Cuti*, No. 08-cr-972 (DAB), 2011 U.S. Dist. LEXIS 84791, 2011 WL 3585988, at *6 n.9 (S.D.N.Y. July 29, 2011) ("The [MVRA] and the [VWPA] do not apply to Defendant Tennant because those statutes only provide for restitution after conviction for a Title 18 offense. Defendant Tennant was only convicted of the substantive offense of Securities Fraud, a Title 15 offense."). Because Petit was convicted of securities fraud -- a Title 15 offense -- the MVRA does not mandate and the VWPA does not authorize the Court to impose restitution on Petit.

*United States v. Petit*, 541 F. Supp. 3d 304, 306-08 (S.D.N.Y. 2021).

Significantly, even the provisions of the "aiding and abetting" statute, 18 U.S.C. § 2, do not rescue a claim for restitution. *Id*. at 308.

The offense of conviction in this matter does not appear in Title 18 of the United States Code. Accordingly, restitution should not be ordered in this matter.

    3. <u>Restitution for investigations should not be ordered in this matter</u>.

The requirement that the victim be "directly and proximately harmed" encompasses the traditional "but for" and proximate cause analyses. *In re McNulty*, 597 F.3d 344, 350 (6th Cir. 2010). The requirement contemplates that the "harm to the victim [must] be closely related to *the conduct inherent to the offense*, rather than merely tangentially linked. *Id*. at 352. In this matter, the government has sought restitution for a National Park Service/hydrologist assessment, Natural Resources Personnel and United States Coast Guard helicopter operations. Those amounts should not be awarded for the reasons that those were entities that if harmed, were tangentially linked and did not experience harm that was inherent to the offenses in this matter.

As a starting point - leaving aside any role that he arguably played in diverting the Platte River - the offenses of which Mr. Howard was convicted involve tampering and damaging property at the beach at Sleeping Bear National Lakeshore. The conduct that Mr. Howard engaged in was with a shovel and involved moving sand and rocks. That is the conduct

13

inherent to the offenses of which he was convicted.[3]  The restitution sought involves investigation.

The government cites two cases in support of its claims for restitution for investigation to the NPS and Coast Guard.  Each is distinguishable.  In citing a Sixth Circuit case, *United States v. Sawyer*, 825 F.3d 287 (6th Cir. 2016), the government states, that, "the Environmental Protection Agency ("EPA") expended employee time and funds *for cleanup of contaminated property using its statutory authority*"  It cites *United States v. Phillips* for the proposition that "[w]hen the government loses money as the direct result of an offense it is as entitled to restitution as any other victim" *Phillips*, 367 F.3d at 849 (9th Cir. 2004)".

The facts of *United States v. Sawyer* differ from the ones in this case in an important way.  In *Sawyer* the government expended funds for, as the government states, "cleanup of contaminated property using its statutory authority."  That is different from this case.  In this matter the government chose to take no such action.   Officer Dekkers testified at trial to the following:

BY MS. BIKSACKY:

Q Were you in any discussions about whether that channel
should be restored?

A Yes.

Q Okay.

A I apologize if I worded that incorrectly before.

Q Okay.

A But I was involved in those decisions.

---

[3]The Defendant does not dispute that a government agency *can* be a victim to whom restitution is owed as the government states in its Memorandum, but it likewise *might not be.*

> Q Let me ask you some specific questions. Did the National Park Service decide to restore that channel?
>
> MR. VALENTINE: Objection, Your Honor.
>
> THE COURT: Overruled. I'll allow it. You may answer.
>
> THE WITNESS: No. They decided not to -- we have decided not to restore it.

(ECF No. 19, PageID.72-73)

That is an important distinction for the reason that it is when the government incurs costs for remedying (in *Phillips* "cleaning up") the results of a defendant's conduct, investigation and assessment costs are recoverable as restitution. As the court in *Phillips* stated:

> [T]he costs of gathering evidence solely for a criminal investigation are not directly related to the crime. However, [*United States v.*] *Salcedo-Lopez* [907 F.2d 97 (9th Cir. 1990] recognizes that "when the government loses money as the direct result of an offense, it is as entitled to restitution as any other victim." A site investigation to determine what damage the defendant's conduct caused and to design an appropriate cleanup plan is likely not a routine matter in all such criminal cases. Rather, the Government incurs such expenses as a direct result of the offense, not as a direct result of the criminal prosecution. In such situations, "investigation costs are a . . . subset of cleanup costs" and recoverable to the same extent.

*United States v. Phillips*, 367 F.3d 846, 863 (9th Cir. 2004).

> *Phillips* was also cited by the Sixth Circuit in its *Sawyer* opinion.
>
> Likewise, in *Phillips*, the court found that the EPA's investigation costs, *a subset of its cleanup and remediation costs*, were recoverable under the restitution statutes, even though the polluted waters were on private property. 367 F.3d at 862-63; see also *United States v. W. Indies Transp., Inc.*, 127 F.3d 299, 315, 37 V.I. 579 (3d Cir. 1997) (affirming district court's award of restitution to the Coast Guard based on the costs *required to clean the environmental damage* caused by defendants' conduct).

*United States v. Sawyer*, 825 F.3d 287, 294 (6th Cir. 2016) (italics added)

The government pursued no cleanup or in this matter - no restoration of the channel to Lake Michigan. Such helicopter and NPS/Natural Resources/hydrologist costs could therefore

not be a subset of either the costs of cleanup or restoration of the beach. Restitution for these things should not be ordered.[4]

The government argues that it was *foreseeable* that Andy Howard's conduct would occasion the government's activities for which it now seeks compensation. It was simply not foreseeable. Taking the evidence in this case in the light most favorable to the government, it is impossible to conclude that when Andy Howard (or anyone else) moved sand with a shovel or moved rocks in a channel of water rushing into Lake Michigan that a National Park Service hydrologist or a United States Coast Guard helicopter would become even remotely involved. A "but for" analysis places the government's restitution claims on even shakier ground. it is impossible to articulate even how "but for" Andy Howard's conduct, the activities giving rise to the government's activities resulting in claims for restitution would ever happen.

## Conclusion

It is respectfully requested that the Court take into consideration the foregoing in deciding any order for restitution or costs.

Respectfully submitted,

Dated: April 10, 2024

/s/ *Anthony J. Valentine*
Anthony J. Valentine
Attorney for Defendant
  Andrew Blair Howard
Ste. 227, 29 Pearl Street, N.W.
Grand Rapids, MI 49503
(616) 288-5410
*tonyvalentinelaw@gmail.com*

---

[4]For some perspective, attached as **Exhibit A** is an online article from Mlive.com dated February 16, 2024, that offers insight into the current state of affairs - the Michigan Department of Natural Resources is exploring a plan to resume dredging of the Platte River mouth in order to ease boater access to Lake Michigan.